FILED
Clerk
District Court
OCT 15 2026
for the Northern Mariana Islands
By________________ (Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

THE GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC,

Petitioner,

vs.

JOHN K. BALDWIN,
BRIDGE CAPITAL LLC,
LAO HOLDINGS N.V.,
SANUM INVESTMENTS LTD., and
SHAWN SCOTT,

Respondents.

CIVIL CASE NO. 22-00011

**DECISION AND ORDER**
Denying LHNV's Motion to Dismiss Amended Petition (ECF No. 58)

In this action, the Petitioner, The Government of the Lao People's Democratic Republic ("GOL"), seeks to enforce foreign arbitral awards against Lao Holdings N.V. ("LHNV") and Sanum Investment Ltd. ("Sanum"), the two award debtors. GOL has also alleged that John K. Baldwin ("Baldwin"), Shawn A. Scott ("Scott") and Bridge Capital LLC ("Bridge Capital")[1] are alter egos of the award debtors, thus seeking to enforce its awards against them under a corporate veil piercing theory. LHNV moves to dismiss the Amended Petition, asserting that this court has neither general nor specific personal jurisdiction over it. *See* LHNV's Mot. Dismiss Am. Pet., ECF No. 58. Having reviewed relevant authority, the parties' filings and the record herein, the court now issues this Decision and Order denying LHNV's Motion to Dismiss as discussed below.

[1] Baldwin and Scott are alleged to each own 50% of Bridge Capital, a corporation of the Northern Mariana Islands. Am. Pet. at ¶¶ 9-9A and 10. ECF No. 55.

## I. BACKGROUND

In a Decision and Order filed on April 3, 2025, the court granted Baldwin and Bridge Capital's Motion to Dismiss the Amended Petition.[2] *See* Decision and Order, ECF No. 111. That decision set forth the history related to the gambling investments in the Lao People's Democratic Republic[3] that was the subject of the underlying arbitration proceedings. *Id.* at 2-7. The court incorporates herein the factual and procedural history set forth in said Decision and Order and briefly summarizes only those facts that are pertinent to the issues raised in LHNV's Motion to Dismiss. These facts are primarily taken from the Amended Petition and the exhibits thereto, and are presumed to be true for the purposes of this motion.

### A. Gaming Investments in Laos

Baldwin and Scott became interested in gaming projects in Laos, and they incorporated Sanum in Macau "as a corporate vehicle" for their "gaming investments in Asia." Am. Pet. at ¶¶ 12 and 26, ECF No. 55. Sanum later partnered with a Laotian company, ST Group, to finance and build gaming businesses in Laos, which included the Savan Vegas Casino. *Id.* at ¶ 26. The investments were funded through loans from Bridge Capital to Sanum. *Id.*

In 2012, LHNV was incorporated in Aruba, the Netherlands Antilles by Baldwin and Scott. *Id.* at ¶ 11. According to the Amended Petition, Baldwin and Scott retained IMC International Management & Trust Co. N.V. ("IMC") in Aruba to create a Dutch corporation. *Id.* at ¶ 40.A. After IMC's fees were paid, in January 2012, IMC used a Dutch corporation it formed in early 2011 – the Mula Blou Holdings, N.V. – and renamed it LHNV. *Id.* The Amended Petition alleges that Baldwin and Scott"inserted LHNV into the corporate ownership chain between themselves and Sanum, with

---

[2] That decision was recently reversed by the Ninth Circuit Court of Appeals on legal grounds. *See* ECF No. 128 (also reported at *Gov't of Lao People's Democratic Republic v. Baldwin*, No. 25-2562, 2026 WL 2752349, at *3 (9th Cir. Sept. 17, 2026). A mandate has not been issued yet.

[3] The Lao People's Democratic Republic is the official state name for the country commonly referred to as "Laos."

Baldwin and Scott each owning 50% of LHNV, and LHNV owning 100% of Sanum.[4] *Id.* at ¶¶ 28 and 41H.

**B. Arbitration Proceedings**

Disputes eventually emerged between LHNV, Sanum and ST Group over the management of the gaming businesses, and GOL eventually became embroiled in these disputes. In August 2012, Sanum and LHNV each filed separate Bilateral Investment Treaty ("BIT") arbitration claims against GOL,[5] alleging "violations of [GOL's] international responsibilities to protect foreign investors under the relevant treaties." *Id.* at ¶¶ 29-30.

On June 15, 2014, the parties settled the BIT I Arbitrations by entering into a Deed of Settlement.[6] 3rd Arbitral Award[7] at ¶ 69, ECF No. 55-9. On June 17, 2014, the parties "entered into a Side Letter amending, correcting and clarifying certain points in the Deed [of Settlement]." *Id.* As part of their agreement, LHNV and Sanum would continue managing and operating the Savan Vegas Casino and would take steps necessary to sell the casino within ten months, with the profits from the sale to be distributed to the casino's owners accordingly. *Id.* at ¶ 70, Am. Pet. at ¶ 73, and Deed of Settlement at ¶¶ 10-11 and 16, ECF No. 55-7. "The BIT I Arbitrations were suspended pending completion of the terms of settlement." 3rd Arbitral Award at ¶ 71, ECF No. 55-9.

Shortly thereafter, the parties each alleged the other had materially breached the terms of the Deed of Settlement, *id.* at ¶¶ 72-76, and the BIT I Arbitrations were reinstated on December 15,

---

[4] GOL now appears to contradict the assertion in the Amended Petition that LHNV owns 100% of Sanum. GOL's Opposition to LHNV's Motion to Dismiss argues that LHNV did not acquire Sanum because "there was no effective contract to transfer Sanum's share to LHNV[.]" GOL's Opp'n at 17, ECF No. 115.

[5] Collectively, these proceedings are referred to as the "BIT I Arbitrations."

[6] The Deed of Settlement, ECF No. 55-7, is appended as Exhibit E to the Amended Petition.

[7] Exhibit G to the Amended Petition is a copy of the arbitration award issued by the Singapore International Arbitration Centre on August 11, 2021. Exhibit G shall be referred to as the "3rd Arbitral Award."

2017.[8] *Id.* at ¶ 76. On August 6, 2019, the BIT I tribunals issued two Final Awards.[9] Am. Pet. at ¶¶ 32-33, ECF No. 55. The BIT I Final Awards dismissed all of LHNV and Sanum's claims and awarded GOL its fees, expenses and costs of the arbitration. *Id.* at ¶ 34. In the LHNV proceeding, GOL was awarded approximately $1.95 million, and in the Sanum arbitration proceeding, GOL was awarded approximately $1.78 million. *Id.*

In the instant action, GOL seeks to enforce the 1st and 2nd Arbitral Awards stemming from the BIT I Arbitrations, in addition to a 3rd Arbitral Award stemming from another arbitration proceeding initiated on December 19, 2017, under the Rules of the Singapore International Arbitration Centre (the "SIAC Proceeding").[10] *Id.* at ¶¶ 5 and 35. That tribunal issued an award on August 11, 2021, dismissing all of LHNV/Sanum's claims and awarding San Marco and Ms. Gass a combined sum of $437,200. 3rd Arbitral Award at ¶ 350, ECF No. 55-9. The SIAC tribunal also awarded GOL a total of $862,425. *Id.* Based on a subrogation agreement GOL entered with San Marco and Ms. Glass on October 28, 2021, GOL seeks to recover the full amount of the SIAC award. Am. Pet. at ¶ 36, ECF No. 55.

GOL made demands on the award debtors to pay the awards, but LHNV and Sanum have not paid any amount. *Id.* at ¶ 37A.

---

[8] Sanum and LHNV also initiated additional BIT arbitrations against GOL that focused on alleged actions taken by GOL *after* the Deed of Settlement was entered (the "BIT II Proceedings). *See* BIT II Decision on Jurisdiction, Admissibility and Liability at ¶ 8, attached as Ex. 6 to Decl. John K. Baldwin, ECF No. 124-7.

[9] Exhibit B to the Amended Petition is a copy of the award issued by the International Centre for Settlement of Investment Disputes ("ICSID") in the arbitration proceeding between LHNV and GOL. Exhibit B shall be referred to as the "1st Arbitral Award." Exhibit D to the Amended Petition is a copy of the award issued by the Permanent Court of Arbitration in the arbitration proceeding between Sanum and GOL. Exhibit D shall be referred to as the "2nd Arbitral Award."

[10] On April 16, 2015, GOL took control of the Savan Vegas Casino. 3rd Arbitral Award at ¶ 78, ECF No. 55-9. GOL entered into a management contract with San Marco Capital Partners, LLC ("San Marco") for the management, sale and marketing of the Savan Vegas Casino, and Kelly Gass signed the contract as the President of San Marco. *Id.* at ¶ 79. Sanum and LHNV initiated the SIAC Proceeding under an arbitration agreement between LHNV/Sanum and San Marco and Ms. Gass. *See* Am. Pet. at ¶ 35, ECF No. 55. GOL intervened as a respondent in the SIAC Proceeding because GOL had indemnified San Marco. *Id.*

### C. Enforcement Actions in Idaho and the CNMI

On April 21, 2020, GOL commenced an action to enforce the awards in the District of Idaho. *See Gov't of Lao People's Democratic Republic v. Baldwin*, No. 2:20-cv-00195-CRK, 2022 WL 2047825, at *3 (D. Idaho June 7, 2022). After granting GOL several attempts to amend its complaint, in 2022, the District of Idaho dismissed GOL's attempt to add LHNV and Sanum as defendants to the action because the court had no specific jurisdiction over Sanum or LHNV. *Id.* at *7. That court also eventually found it had no personal jurisdiction over Baldwin and Bridge Capital. *See Gov't of Lao People's Democratic Republic v. Baldwin*, No. 2:20-cv-00195-CRK, ECF No. 163 (D. Idaho Aug. 29, 2022).

On November 15, 2023, GOL filed the Amended Petition before the court. Am. Pet., ECF No. 55. On December 4, 2023, LHNV filed the instant Motion to Dismiss. ECF No. 58.

On February 16, 2024, the parties stipulated to defer briefing on LHNV's motion until after the court ruled on Baldwin and Bridge Capital's Motion to Dismiss the Amended Petition. Stipulation, ECF No. 62. On February 21, 2024, the court granted the parties' stipulation. *See* Order, ECF No. 64.

Having granted the Baldwin and Bridge Capital's Motion to Dismiss,[11] GOL filed its Opposition to the instant Motion to Dismiss on April 18, 2025, and LNHV filed its Reply thereto on May 16, 2025. *See* ECF Nos. 115 and 124.

## II. LEGAL STANDARD

LHNV moves to dismiss the Amended Petition for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The burden is on GOL to show that personal jurisdiction exists. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Where, as here, the court decides the motion to dismiss based on the pleadings and affidavits submitted by the parties without conducting an evidentiary hearing, the plaintiff "need make only a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Pebble Beach Co. v.* Caddy, 453 F.3d 1151, 1154 (9th Cir 2006) (quoting *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001),

---

[11] As noted in footnote 2, this court's ruling was eventually reversed by the Ninth Circuit.

*abrogated on other grounds by Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017)). The court must accept uncontroverted allegations contained within the plaintiff's complaint as true and must resolve conflicts between statements contained within the parties' affidavits in the plaintiff's favor. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). However, the court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Alexander v. Circus Circus Enters., Inc.*, 972 F.2d 261, 262 (9th Cir. 1992) (quoting *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.,* 557 F.2d 1280, 1284 (9th Cir. 1977)).

Because no federal statute governs personal jurisdiction, the court may exercise personal jurisdiction over a defendant if (1) the applicable state long-arm statute permits it, and (2) exercising that jurisdiction does not violate federal due process standards. *Boschetto*, 539 F.3d at 1015. "The CNMI's long-arm statute 'subjects both residents and nonresidents to [personal] jurisdiction to the fullest extent allowable under the due process standards of the U.S. Constitution.'" *Saipan Air, Inc. v. Stukes*, No. 1:12-CV-00015, 2013 WL 670026, at *3 (D. N. Mar. I. Feb. 25, 2013) (quoting *Bank of Saipan v. Superior Court*, 6 N. Mar. I. 242, 252, 2001 WL 34876570 (2001) (*per curiam*)); *accord* 7 N. Mar. I. Code § 1102(e). Therefore, the court may exercise personal jurisdiction over a defendant if doing so comports with federal constitutional due process.

The due process issue here is whether LHNV's contacts with the CNMI are of such quality and nature that it could reasonably expect "being haled into court there." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980). Due process is satisfied "when *in personam* jurisdiction is asserted over a nonresident corporate defendant that has certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quotation omitted).

"There are two forms of personal jurisdiction that a forum state may exercise over a nonresident defendant – general jurisdiction and specific jurisdiction." *Boschetto*, 539 F.3d at 1016. LHNV argues that this court has neither general nor specific jurisdiction over LHNV.

///

///

## III. ANALYSIS

### A. Whether this court has general jurisdiction over LHNV

"In the context of general jurisdiction, minimum contacts exist where a defendant has 'substantial' or 'continuous and systematic' contacts with the forum state, even if the case is unrelated to those contacts." *Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1171 (9th Cir 2006) (quoting *Helicopteros*, 466 U.S. at 415). "The standard for general jurisdiction is high; contacts with a state must 'approximate physical presence.'" *Id.* at 1169 (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1086, 1086 (9th Cir. 2000)). "General jurisdiction requires affiliations so continuous and systematic as to render the foreign corporation essentially at home in the forum State, *i.e.*, comparable to a domestic enterprise in that [s]tate. Such contacts must be constant and pervasive." *Ranza v. Nike, Inc.,* 793 F.3d 1059, 1069 (9th Cir 2015) (quoting *Daimler AG v. Bauman*, 571 U.S., 117, 133 n.11 (2014)(citations, internal quotation marks and alterations omitted). For corporations, the "paradigm" forums for general jurisdiction are "the place of incorporation and principal place of business." *Daimler*, 571 U.S. at 137. "Only in an 'exceptional case' will general jurisdiction be available anywhere else." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014) (quoting *Daimler*, 571 U.S. at 139 n.19).

Here, it is undisputed that LHNV was incorporated in Aruba. *See* Am. Petition at ¶¶ 11, 28 and 40; Decl. John K. Baldwin at ¶ 4, ECF No. 58-2. The Amended Petition, however, asserts that "LHNV's principal place of business is Saipan." Am. Petition at ¶ 21, ECF No. 55. This assertion is refuted by LHNV.

To determine a corporation's principal place of business for general jurisdiction purposes, LHNV asks the court to apply the framework set forth in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010). In *Hertz*, the Supreme Court explained that a corporation's principal of business is "the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Id.* at 92-93. It is often referred to by courts as the "corporation's 'nerve center.'" *Id.* at 93.

> in practice it should normally be the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Id.*

In *3123 SMB LLC v. Horn*, the Ninth Circuit analyzed whether *Hertz's* "nerve center test" should be applied to holding companies.[12] *Horn*, 880 F.3d 461 (9th Cir. 2018). There, the Ninth Circuit recognized that a holding company is not a "normal" corporation because "[i]t engages in little activity, so there is little to direct, control, or coordinate. Its purpose – holding interest in other companies – is passive." *Id.* at 465. Because the holding company in *Horn* "engaged in no activity other than incorporation" in its short existence before the filing of the law suit, the Ninth Circuit concluded that its principal place of business "is the place where it has its board meetings,[13] regardless of whether such meetings have already occurred, unless evidence shows that the corporation is directed from elsewhere." *Id.* at 468.

The court agrees with LHNV that the "nerve center" test in *Hertz*, not the board meeting test of *Horn*, is applicable here to determine LHNV's principal place of business. In discussing why the holding in *Horn* was inapplicable, the district court in *Travelers Com. Ins. Co. v. Liberty Utils. (CalPeco Elec.) LLC* explained

> the facts of *Horn* are distinguishable from the present case. Significantly, the holding company in *Horn* was only 25 days old and "[i]n that brief time, the only business that [said company] conducted was to incorporate." Given the difficulty in determining the holding company's nerve center, the court thus concluded that it could look to the location of its board meetings even if such meetings have not yet occurred. Here, however, Defendant's evidence shows that LUCo was incorporated in 2010 under the laws of Delaware and thus, it is not a recently formed holding company.

*Travelers*, 2022 WL 992935, at *3 (E.D. Cal. Apr. 1, 2022) (internal citations omitted). The court

---

[12] GOL's Opposition to the Motion to Dismiss argues that LHNV was actually incorporated to "benefit from the protections afforded by" the BIT between Laos and the Kingdom of the Netherlands and for the purpose of litigation against GOL, which is "LHNV's business." GOL's Opp'n at 19, ECF No. 115. GOL's assertion that LHNV is in the "litigation" business instead of being a holding company is directly contradicted by LHNV's Articles of Incorporation. Under Article 3, LHNV's first objective "shall be . . . to act as a holding company[.]" LHNV's Articles of Incorporation at Art. 3, ¶ 1, Ex. 4 to Decl. David J. Branson, ECF No. 115-1. Nothing in Article 3 mentions litigation against GOL.

[13] GOL's Opposition makes much ado about whether Baldwin and Scott attended annual *shareholder* meetings in Aruba. *See* Opp'n at 15-16, ECF No. 115. GOL appears to confuse the place of *shareholder* meetings with the place where a holding company has its *board* meetings.

in *Christensen v. Liberty Utils.* reached a similar conclusion in finding that *"Horn* does not apply." 2022 WL 3226118, at *4 (E.D. Cal. Aug. 10. 2023). In this case, based on the Amended Petition, LHNV was incorporated in 2012 under the laws of Aruba. It is not a recently formed holding company, and thus the limited holding of *Horn* is inapplicable. The court will instead apply the "nerve center" test of *Hertz.*

Here, LHNV's only office is in Oranjestad, Aruba. Decl. John K. Baldwin at ¶ 5, ECF No. 58-2. *See also* Am. Petition at ¶ 11, ECF No. 55 ("LHNV has a registered office in Aruba[.]"). LHNV maintains that it has no other office anywhere else in the world, including in Saipan or elsewhere in the CNMI. Decl. John K. Baldwin at ¶ 5, ECF No. 58-2. LHNV is a holding company,[14] and its limited business is "generally conducted through LHNV's Managing Director, IMC, in Aruba." *Id.* at ¶ 7. IMC's actions include "filing LHNV's financial reports and shareholders register with the Aruba Chamber of Commerce, maintaining LHVN's entry in the Aruba Chamber of Commerce register, filing LHNV's tax returns with the Aruba tax authority, and other bookkeeping and secretarial acts." *Id.* "LHNV's accounting is performed in Cambodia." *Id.* at ¶ 6. Based on *Hertz*, it would appear that LHNV's "nerve center" is Aruba because that is where it maintains its headquarters and where its Managing Director coordinates various activities for LHNV.

GOL asserts that "LHNV has no employees in Aruba" and "does not conduct any business from Aruba." Am. Petition at ¶ 21, ECF No. 55. GOL also contends that "LHNV's business is conducted in Saipan under the control of Baldwin and Scott, residents in Saipan, and through the activities of Bridge employees in Saipan[.]" *Id.* GOL bears the burden of establishing federal jurisdiction, yet it has not supported these allegations with any affidavits or specific evidence.

Finally, LHNV appears to argue that the residency of LHNV's only shareholders is relevant to LHNV's principal place of business determination. It is not. As the Ninth Circuit stated in *Horn*,

---

[14] Again, GOL refutes this assertion and contends that"LHNV is not passive[.] . . . LHNV's business is coordinating, planning, and paying counsel and ICSID for litigation claims against [GOL]. . . . Baldwin ran LHNV's business by paying lawyers to sue [GOL], hoping to make [GOL] pay him hundreds of millions." GOL's Opp'n at 11-12, ECF No. 115. GOL's conclusory allegations are insufficient to refute the sworn declaration of Mr. Baldwin and LHNV's Articles of Incorporation as provided in GOL's own Exhibit 4.

"the connection between the state where a holding company conducts its business, on the one hand, and the states where its officers and directors reside, on the other, is tenuous. . . . Many holding companies incorporate and hold board meetings in sparsely populated states. . . , while their board members reside elsewhere." *Horn*, 880 F.3d. at 469. Therefore, whether Baldwin and Scott are residents of the CNMI does nothing to further GOL's goal of establishing that LHNV's principal place of business is the CNMI.

Ultimately, the court finds that LHNV was incorporated in Aruba and its principal place of business is Aruba, where its Managing Director carries out LHNV's various financial activities.

To support its assertion that Baldwin directed LHNV's litigation activities (*i.e.* its business activity) from Saipan, GOL also identified eight witness statements signed by Baldwin in Saipan. *See* GOL's Opp'n at 22-23, ECF No. 115. The court notes that only half of these witness statement were signed in LHNV's arbitration proceedings; the other half of the signed statements were on behalf of Sanum in other arbitration proceedings. *Id.* and LHNV's Reply at 5, ECF No. 124. Four witness statements signed by Baldwin in Saipan on behalf of LHNV over the course of a decade[15] is hardly "substantial" and does not come close to the "continuous and systematic" contacts required to establish general jurisdiction. Additionally, as argued by LHNV, the actions taken by Bridge employees in Saipan *before* LHNV was even incorporated are not relevant to whether LHNV's nerve center is in Saipan or whether LHNV was engaging in business in Saipan since LHNV did not even exist then.

Given that "[t]he standard for general jurisdiction is high," requiring "continuous and systematic" contacts that "approximate physical presence" within the state, *Tuazon*, 433 F.3d at 1169 and 1171, the court finds that GOL has not met its burden of making a *prima facie* showing that LHNV's direct contacts with the CNMI are sufficient for the court to exercise general jurisdiction over LHNV.

///

---

[15] Ten years have passed from LHNV's incorporation in 2012 to the inception of this case in 2022.

**B. The Alter Ego Theory**

GOL next attempts to establish jurisdiction over LHNV by attributing the contacts of Baldwin, Scott and Bridge Capital[16] to LHNV. Although the *Ranza v. Nike, Inc.* case, 793 F.3d 1059 (9th Cir. 2015) is not cited in its Opposition, it appears to the court that GOL is arguing that jurisdiction under the alter ego doctrine is applicable here.

"[T]he alter ego test has traditionally been used to bring a controlling parent into a controlled subsidiary's home forum[.]" *Id.* at 1071. In *Ranza*, however, the Ninth Circuit held that "the alter ego test may be used to extend personal jurisdiction to a foreign parent or subsidiary when, in actuality, the foreign entity is not really separate from its domestic affiliate." *Id.* at 1073. The Ninth Circuit reasoned

> Because we treat the parent and subsidiary as "not really separate entities" if they satisfy the alter ego analysis, . . . there is no greater justification for bringing the parent into the subsidiary's forum than for doing the reverse. . . . In fact, exercising general jurisdiction over both entities in the parent's forum is just as defensible (if not more so) under due process principles as haling the parent into the subsidiary's forum. If the two entities are to be treated as a single enterprise, the stronger candidate for the "home" of that enterprise is likely where the controlling parent most closely affiliates. . . . And the enterprise as a whole should reasonably foresee being subject to suit for all of its activities – even those unrelated to the forum – where it most closely affiliates.

*Id.* at 1072-73 (internal citations and footnote omitted).

Thus, the court next analyzes whether GOL has satisfied the alter ego test.

1. <u>Legal Standard re Alter Ego Test</u>

Under the alter ego test, a plaintiff "must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.'" *Id.* (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (alterations in original)). The first prong of the test requires

---

[16] The Amended Petition alleges that both Baldwin and Scott maintain residences in Saipan and conduct business from and through the offices of Bridge Capital, which is incorporated in the CNMI and has its principal place of business in Saipan. Am. Pet. at ¶¶ 18-19. Baldwin, Scott and Bridge Capital's contacts with this form are not disputed by LHNV in its filings.

> "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." This test envisions pervasive control over the subsidiary, such as when a parent corporation "dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation." Total ownership and shared management personnel are alone insufficient to establish the requisite level of control.

*Id.* (internal citations omitted).

In determining whether there is sufficient unity of interest and ownership to support alter ego liability, courts consider various factors such as:

> commingling of funds, failure to maintain minutes or adequate corporate records, identification of the equitable owners with the domination and control of the two entities, the use of the same office or business locations, the identical equitable ownership of the two entities, the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual, and failure to adequately capitalize a corporation.

*Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp.3d 42, 52 (N.D. Cal. 2020).

2. Alter Ego Application

The court reviews the allegation in the Amended Petition to determine whether GOL has met its prima facie burden. With regard to a unity of interest and ownership among Baldwin, Scott, Bridge Capital and LHNV, the Amended Petition specifically asserts the following:[17]

- LHNV's business is conducted in Saipan under the control of Baldwin and Scott and through Bridge Capital employees in Saipan. Am. Pet. at ¶ 21, ECF No. 55;
- LHNV "continuously and systematically conduct[s] business in Saipan through Baldwin, Scott and Bridge [Capital] activities in their names, and maintain [the] arbitrations under Baldwin[] and Scott['s] control and direction, using Bridge employees, facilities and bank accounts[.]" *Id.* at ¶ 25;
- Although Baldwin and Scott never held the title of officer or director of LHNV between August 2012 and July 2019, as mere shareholders, they retained legal counsel in August 2012 to have LHNV sue GOL. *Id.* at ¶¶ 40.C and 41;
- Baldwin and Scott initiated the arbitrations and appeals therefrom "without regard to the LHNV corporate formalities of securing approval by the LHNV Managing Director and/or Supervisory Board of their appointments of counsel and/or supervision of their legal activities." *Id.* at ¶41.A;

---

[17] The numerous allegations regarding unity of interest and ownership among Baldwin, Scott, Bridge Capital and Sanum are not included in the list below because the court must specifically focus on whether Baldwin, Scott, Bridge Capital and *LHNV* are alter egos of each other.

- Baldwin and Scott submitted two Powers of Attorney to ICSID that falsely asserted LHNV's corporate approval to proceed with the arbitration actions. *Id.* at ¶¶ 41.B - 41.E;

- In 2016, Baldwin and Scott had not received corporate authority from LHNV's Managing Director or Board of Supervisors before commencing the second ICSID arbitration. *Id.* at ¶ 41.F;

- Baldwin signed numerous witness statements in the arbitration proceedings attesting that he was the "Authorized Representative" of LHNV. *Id.* at ¶ 41.G;

- Baldwin and Scott agreed to the Deed of Settlement with GOL, purportedly surrendering LHNV's $1 billion ICSID claim without informing LHNV's Managing Director or Supervisory Board that Baldwin, as the "'Authorized Representative' of LHNV" had surrendered such claim. *Id.* at ¶ 41.I;

- After signing the Deed of Settlement, Baldwin and Scott "removed $20 million from the [Savan Vegas C]asino, bypassing Sanum and [LHNV] . . . by sending the funds to Bridge [Capital], themselves and other related persons[,]" without informing LHNV's Managing Director or Supervisory Board that they had taken the $20 million. *Id.* at ¶ 41.J;

- After GOL took control over the Savan Vegas Casino and sold it, "Baldwin and Scott did not inform the LHNV Board of Supervisors that [GOL] had sold the only asset of LHNV and that the sale price was in an escrow account in Singapore." *Id.* at ¶ 41.L;

- After the sale of the Savan Vegas Casino, the tribunal ordered that approximately $1.9 million from the sale be paid to LHNV and its subsidiary, Sanum. Baldwin and Scott, however, did not report the payment to LHNV's Managing Director or Board of Supervisors. LHNV did not receive any of the sale proceeds because Baldwin and Scott "accepted the funds as their own." *Id.* at ¶ 41.M;

- Baldwin and Scott paid for all of LHNV's various legal fees and expenses from bank accounts in the name of Baldwin and Bridge Capital. LHNV did not use its bank account for any of its litigation expenses. *Id.* at ¶ 41.N;

- In July 2023, the ICSID tribunal was informed by Respondents' counsel that in 2021 IMC "ratified" Baldwin's action in commencing and conducting the arbitration proceedings that began in 2012. Baldwin, Scott and Bridge Capital allegedly "agreed to indemnify IMC, and to pay IMC for the risk IMC assumed by the ratification." *Id.* at ¶¶ 41.S and 41.V;

- Baldwin and Scott used Bridge Capital "to create LHNV solely to use as a vehicle to sue" GOL under a more favorable treaty than the treaty used by Sanum. *Id.* at ¶ 46;

- Baldwin diverted corporate assets and paid $575,000 to a material witness who "would have 'shed crucial light on the legality or illegality of many of the disbursements at issue." not to testify at the arbitration proceedings. Baldwin did so "to avoid criminal exposure[,] . . . to protect himself by preventing the witness from testifying in the arbitration that Baldwin had paid bribes to Laos government officials[.]" *Id.* at ¶¶ 63-64 and 66;

- Baldwin directed John Crawford, Bridge Capital and Sanum's former CFO, to pay the legal fees of the law firm hired to represent LHNV and Sanum's interests in the arbitration proceedings. The retainer agreement listed Bridge Capital, LHNV and Sanum as the clients, and the legal invoices were sent to Bridge Capital's Saipan office.

Crawford altered the legal invoices to create the impression that legal invoices were addressed to the Savan Vegas Casino because he did not want the Laos bank, and ultimately GOL, to notice that "he was paying a Bridge/LHNV/Sanum invoice with Savan Vegas [Casino] funds." *Id.* at ¶¶ 50, 68-70; and

- "In this fraud and abuse of the corporate form, Baldwin paid his legal bills to sue the Government using 20% of the Government's casino funds and abused the corporate form of Bridge, Lao Holdings, Sanum and Savan Vegas." *Id.* at ¶ 71.

Based on the above factual allegations in the Amended Petition, the court finds that GOL has satisfied the first pong of the alter ego test that there is such unity of interest and ownership between LHNV, Baldwin, Scott and Bridge Capital that the separate personalities no longer exist. The Amended Petition alleges commingling of funds from the Savan Vegas Casino that belonged to its shareholders (LHNV, GOL and ST Group) that were instead transferred to Bridge Capital, Baldwin and other Baldwin-related individuals and entities, and that in directing that such payments be made, Baldwin and Scott abused the corporate form of LHNV by, among other things, (1) retaining counsel and initiating the arbitration proceedings as LHNV's "Authorized Representative," (2) entering into the Deed of Settlement that potentially surrendered LHNV's $1 billion claim, and (3) accepting the funds from the sale of the Savan Vegas Casino as their own, all without first securing approval from the LHNV Managing Director or its Supervisory Board. The Amended Petition also alleges identical ownership of the various entities, since Baldwin and Scott are equal shareholders in Bridge Capital and LHNV, with LHNV owning 100% of Sanum. Mr. Crawford, the former CFO for Bridge Capital and Sanum, is also alleged to have altered legal invoices in order to deceive the Laos bank and GOL, keeping them from discovering that the casino's funds were being used to pay the legal invoices of not only Sanum but Bridge Capital and LHNV as well. In sum, GOL has pled many of the factors of the first prong of the alter ego test. The court finds that GOL has made a prima facie case that there is such unity of interest and ownership that the separate personalties of Baldwin, Scott, Bridge Capital and Sanum no longer exist.[18]

---

[18] The finding that GOL has made a prima facie case as to the unity of interest and ownership prong is consistent with the court's earlier ruling that sought to challenge the filing of the Amended Petition on futility grounds. Baldwin and Bridge Capital opposed the filing of the then proposed Amended Petition, arguing that it failed to state a valid veil-piercing or alter ego claim, but the court found that the claim was plausible. *See* Order Granting GOL's Mot. Amend at 1-3, ECF No. 50.

Having satisfied the first prong, the court next analyzes whether GOL has made a prima facie case that failure to disregard their separate identities would result in fraud or injustice. Here, the Amended Petition asserts that GOL has made demand upon LHNV and Sanum to pay the arbitration awards, but they have not paid any amount. Am. Pet. at ¶ 37A, ECF No. 55.

> Baldwin and Scott view [LHNV], Sanum, and Bridge [Capital], the corporations and their funds as their personal tools and their personal funds which they can use for whatever reason, including committing criminal acts. They have no regard for the corporate form or corporate purposes. Respondents' abuse of corporate form in many instances to commit fraud on its partners, Tribunals and government entities and to commit criminal acts is compelling evidence mandating that this court pierce the corporate veils of [LHNV], Sanum and Bridge. Equity demands that Baldwin and Scott are personally liable for the debts of [LHNV] and Sanum incurred in these arbitrations.

*Id.* at ¶ 79.

Based on these assertions and the other claims noted in the Amended Petition, GOL has sufficiently alleged facts to meet its burden of showing that Baldwin, Scott and Bridge Capital have benefitted from their alleged misconduct and purported abuse of the corporate forms of LHNV and Sanum. The court further finds that GOL has made a prima facie case that failure to disregard said entities separate identities would result in injustice to GOL, who has yet to be paid for the three arbitral awards in its favor.

## IV. CONCLUSION

Imputing Baldwin, Scott and Bridge Capital's contacts onto their foreign subsidiary, the court finds that LHNV's contacts with the CNMI are of such quality and nature that LHNV could reasonably expect being haled into court in this forum. Having found that GOL has met its burden of establishing that this court has general jurisdiction over LHNV under the alter ego theory, there is no need for the court to address LHNV's remaining argument that this court lacks specific jurisdiction over Sanum or GOL's request for jurisdictional discovery. Accordingly, the court denies LHNV's Motion to Dismiss the Amended Petition.

**IT IS SO ORDERED.**

**Frances M. Tydingco-Gatewood**
**Designated Judge**
**Dated: Oct 15, 2026**