FILED
Clerk
District Court
OCT 15 2026
for the Northern Mariana Islands
By AK
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

THE GOVERNMENT OF THE LAO PEOPLE'S DEMOCRATIC REPUBLIC,

Petitioner,

vs.

JOHN K. BALDWIN,
BRIDGE CAPITAL LLC,
LAO HOLDINGS N.V.,
SANUM INVESTMENTS LTD., and
SHAWN SCOTT,

Respondents.

CIVIL CASE NO. 22-00011

**DECISION AND ORDER**
Denying Sanum's Motion to Dismiss Amended Petition (ECF No. 113)

In this action, the Petitioner, The Government of the Lao People's Democratic Republic ("GOL"), seeks to enforce foreign arbitral awards against the two award debtors – Lao Holdings N.V. ("LHNV") and Sanum Investment Ltd. ("Sanum"). The Amended Petition also includes three other respondents – John K. Baldwin ("Baldwin"), Shawn A. Scott ("Scott") and Bridge Capital LLC ("Bridge Capital") – whom GOL asserts are the alter egos of the award debtors and seeks to enforce its awards against the three respondents under a corporate veil piercing theory. Sanum now moves to dismiss the Amended Petition, asserting that this court has neither general nor specific personal jurisdiction over it. *See* Sanum's Mot. Dismiss Am. Pet., ECF No. 113. Having reviewed relevant authority as well as the parties' filings and the record herein, the court now issues this Decision and Order denying Sanum's Motion to Dismiss as discussed below.

## I. BACKGROUND

On April 3, 2025, this court issued a Decision and Order granting Respondents Baldwin and

Bridge Capital's Motion to Dismiss the Amended Petition.[1] *See* Decision and Order, ECF No. 111. That Decision and Order set forth the long history related to the dispute over gambling ventures in the Lao People's Democratic Republic.[2] *Id.* at 2-7. The court herein incorporates the factual and procedural history set forth in said Decision and Order and briefly summarizes only those facts that are pertinent to the issues raised in Sanum's Motion to Dismiss. These facts are primarily taken from the Amended Petition and the exhibits thereto, and are presumed to be true for the purposes of this motion.

**A. Gaming Investments in Laos**

In 2007, Baldwin and Scott became involved in casino and gaming businesses in Laos. Am. Pet., at ¶ 26, ECF No. 55. They incorporated Sanum in Macau SAR. *Id.* at ¶ 12. Sanum then partnered with a Laotion conglomerate, ST Group, to finance the construction of various gaming projects, including the Savan Vegas Casino in Savannakhet, Laos. *Id.* at ¶ 26. These investments were funded through loans from Bridge Capital to Sanum. *Id.* Bridge Capital is a Northern Mariana Islands corporation in which Baldwin and Scott each own 50% share. *Id.* at ¶¶ 9-9A and 10.

In 2012, Baldwin and Scott incorporated LHNV in Aruba, the Netherlands Antilles.[3] Baldwin and Scott allegedly "inserted LHNV into the corporate ownership chain between themselves and Sanum." *Id.* at ¶¶ 28 and 41.H. Baldwin and Scott each own 50% of LHNV, and LHNV owns 100% of Sanum. *Id.* at ¶ 28.

**B. Arbitration Proceedings**

Disputes eventually emerged, and in August 2012, Sanum and LHNV each filed separate

---

[1] That decision was recently reversed by the Ninth Circuit Court of Appeals on legal grounds. *See* ECF No. 128 (also reported at *Gov't of Lao People's Democratic Republic v. Baldwin*, No. 25-2562, 2026 WL 2752349, at *3 (9th Cir. Sept. 17, 2026). A mandate has not been issued yet.

[2] The Lao People's Democratic Republic is the official state name for the country commonly referred to as "Laos."

[3] According to the Amended Petition, Baldwin and Scott retained IMC International Management & Trust Co. N.V. ("IMC") in Aruba to create a Dutch corporation. Am. Petition at ¶ 40.A, ECF No. 55. After IMC's fees were paid, in January 2012, IMC used a Dutch corporation it formed in early 2011 – the Mula Blou Holdings, N.V. – and renamed it LHNV. *Id.*

Bilateral Investment Treaty ("BIT") arbitration claims against GOL.[4] *Id.* at ¶¶ 29-30.

On June 15, 2014, the parties settled the BIT I Arbitrations by entering into a Deed of Settlement. 3rd Arbitral Award[5] at ¶ 69, ECF No. 55-9. On June 17, 2014, the parties "entered into a Side Letter amending, correcting and clarifying certain points in the Deed [of Settlement]." *Id.* Among other terms in the Deed of Settlement, LHNV and Sanum would continue to manage and operate the Savan Vegas Casino and would take steps necessary to sell said casino within ten months, with profits from the sale to be distributed to the casino's owners accordingly. *Id.* at ¶ 70, Am. Pet. at ¶ 73, and Deed of Settlement[6] at ¶¶ 10-11 and 16. "The BIT I Arbitrations were suspended pending completion of the terms of settlement." 3rd Arbitral Award at ¶ 71.

Shortly thereafter, the parties each alleged the other had materially breached the terms of the Deed of Settlement, *id.* at ¶¶ 72-76, and the BIT I Arbitrations were reinstated on December 15, 2017.[7] *Id.* at ¶ 76. On August 6, 2019, the BIT I tribunals issued two Final Awards.[8] Am. Pet. at ¶¶ 32-33, ECF No. 55. The BIT I Final Awards dismissed all of LHNV and Sanum's claims and awarded GOL its fees, expenses and costs of the arbitration. *Id.* at ¶ 34. In the LHNV proceeding, GOL was awarded approximately $1.95 million, and in the Sanum arbitration proceeding, GOL was awarded approximately $1.78 million. *Id.*

---

[4] Collectively, these proceedings are referred to as the "BIT I Arbitrations."

[5] Exhibit G to the Amended Petition is a copy of the arbitration award issued by the Singapore International Arbitration Centre on August 11, 2021. Exhibit G shall be referred to as the "3rd Arbitral Award."

[6] The Deed of Settlement, ECF No. 55-7, is appended as Exhibit E to the Amended Petition.

[7] Sanum and LHNV also initiated additional BIT arbitrations against GOL (the "BIT II Proceedings). The BIT II Proceedings focused on actions by GOL *after* the Deed of Settlement was entered. *See* BIT II Decision on Jurisdiction, Admissibility and Liability at ¶ 8, attached as Ex. 6 to Decl. John K. Baldwin, ECF No. 124-7.

[8] Exhibit B to the Amended Petition is a copy of the award issued by the International Centre for Settlement of Investment Disputes in the arbitration proceeding between LHNV and GOL. Exhibit B shall be referred to as the "1st Arbitral Award." Exhibit D to the Amended Petition is a copy of the award issued by the Permanent Court of Arbitration in the arbitration proceeding between Sanum and GOL. Exhibit D shall be referred to as the "2nd Arbitral Award."

In the instant action, GOL seeks to enforce the 1st and 2nd Arbitral Awards stemming from the BIT I Arbitrations, in addition to a 3rd Arbitral Award stemming from another arbitration proceeding initiated on December 19, 2017, under the Rules of the Singapore International Arbitration Centre (the "SIAC Proceeding").[9] *Id.* at ¶¶ 5 and 35. That tribunal issued an award on August 11, 2021, dismissing all of LHNV and Sanum's claims and awarding San Marco and Ms. Gass a combined sum of $437,200. 3rd Arbitral Award at ¶ 350, ECF No. 55-9. The SIAC tribunal also awarded GOL a total of $862,425. *Id.* Based on a subrogation agreement GOL entered with San Marco and Ms. Glass on October 28, 2021, GOL sought to recover the full amount of the SIAC award. Am. Pet. at ¶ 36, ECF No. 55.

**C. Enforcement Actions in Idaho and the CNMI**

GOL made demands on the award debtors to pay the awards, but LHNV and Sanum have not paid any amount. *Id.* at ¶ 37A.

On April 21, 2020, GOL commenced an action to enforce the awards in the District of Idaho. *See Gov't of Lao People's Democratic Republic v. Baldwin*, No. 2:20-cv-00195-CRK, 2022 WL 2047825, at *3 (D. Idaho June 7, 2022). After granting GOL several attempts to amend its complaint, in 2022, the District of Idaho dismissed GOL's attempt to add LHNV and Sanum as defendants to the action because the court had no specific jurisdiction over Sanum or LHNV. *Id.* at *7. That court also eventually found it had no personal jurisdiction over Baldwin and Bridge Capital. *See Gov't of Lao People's Democratic Republic v. Baldwin*, No. 2:20-cv-00195-CRK, ECF No. 163 (D. Idaho Aug. 29, 2022).

On November 15, 2023, GOL filed the Amended Petition before the court. Am. Pet., ECF

///

---

[9] On April 16, 2015, GOL took control of the Savan Vegas Casino. 3rd Arbitral Award at ¶ 78, ECF No. 55-9. GOL entered into a management contract with San Marco Capital Partners, LLC ("San Marco") for the management, sale and marketing of the Savan Vegas Casino, and Kelly Gass signed the contract as the President of San Marco. *Id.* at ¶ 79. Sanum and LHNV initiated the SIAC Proceeding under an arbitration agreement between LHNV/Sanum and San Marco and Ms. Gass. *See* Am. Pet. at ¶ 35, ECF No. 55. GOL intervened as a respondent in the SIAC Proceeding because GOL had indemnified San Marco. *Id.*

No. 55. On April 18, 2025,[10] Sanum filed the instant Motion to Dismiss. ECF No. 113. GOL filed its Opposition to the instant Motion to Dismiss on May 19, 2025, and Sanum filed its Reply thereto on June 16, 2025. *See* ECF Nos. 125-26.

## II. LEGAL STANDARD

Sanum moves to dismiss the Amended Petition for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The burden is on GOL to show that personal jurisdiction exists. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Where, as here, the court decides the motion to dismiss based on the pleadings and affidavits submitted by the parties without conducting an evidentiary hearing, the plaintiff "need make only a *prima facie* showing of jurisdictional facts to withstand the motion to dismiss." *Pebble Beach Co. v.* Caddy, 453 F.3d 1151, 1154 (9th Cir 2006) (quoting *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001), *abrogated on other grounds by Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017)). The court must accept uncontroverted allegations contained within the plaintiff's complaint as true and must resolve conflicts between statements contained within the parties' affidavits in the plaintiff's favor. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). However, the court "may not assume the truth of allegations in a pleading which are contradicted by affidavit." *Alexander v. Circus Circus Enters., Inc.*, 972 F.2d 261, 262 (9th Cir. 1992) (quoting *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.,* 557 F.2d 1280, 1284 (9th Cir. 1977)).

Because no federal statute governs personal jurisdiction, the court may exercise personal jurisdiction over a defendant if (1) the applicable state long-arm statute permits it, and (2) exercising that jurisdiction does not violate federal due process standards. *Boschetto*, 539 F.3d at 1015. "The CNMI's long-arm statute 'subjects both residents and nonresidents to [personal] jurisdiction to the fullest extent allowable under the due process standards of the U.S. Constitution.'" *Saipan Air, Inc. v. Stukes*, No. 1:12-CV-00015, 2013 WL 670026, at *3 (D. N. Mar. I. Feb. 25, 2013) (quoting *Bank of Saipan v. Superior Court*, 6 N. Mar. I. 242, 252, 2001 WL 34876570 (2001) (*per curiam*)); *accord*

---

[10] The parties stipulated to extend the deadline for Sanum to respond to the Amended Petition until fifteen days after the court ruled on the Baldwin and Bridge Capital Motion to Dismiss. *See* Stipulation to Extend Time to File Responsive Pleadings, ECF No. 86, and Order, ECF No. 87.

7 N. Mar. I. Code § 1102(e). Therefore, the court may exercise personal jurisdiction over a defendant if doing so comports with federal constitutional due process.

The due process issue here is whether Sanum's contacts with the CNMI are of such quality and nature that it could reasonably expect "being haled into court there." *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980). Due process is satisfied "when *in personam* jurisdiction is asserted over a nonresident corporate defendant that has certain minimum contacts with [the forum] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (quotation omitted).

"There are two forms of personal jurisdiction that a forum state may exercise over a nonresident defendant – general jurisdiction and specific jurisdiction." *Boschetto*, 539 F.3d at 1016. GOL asserts that this court has both general and specific jurisdiction over Sanum.

## III. ANALYSIS

### A. Whether this court has general jurisdiction over Sanum

"In the context of general jurisdiction, minimum contacts exist where a defendant has 'substantial' or 'continuous and systematic' contacts with the forum state, even if the case is unrelated to those contacts." *Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1171 (9th Cir 2006) (quoting *Helicopteros*, 466 U.S. at 415). "The standard for general jurisdiction is high; contacts with a state must 'approximate physical presence.'" *Id.* at 1169 (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1086, 1086 (9th Cir. 2000)). "General jurisdiction requires affiliations so continuous and systematic as to render the foreign corporation essentially at home in the forum State, *i.e.*, comparable to a domestic enterprise in that [s]tate. Such contacts must be constant and pervasive." *Ranza v. Nike, Inc.,* 793 F.3d 1059, 1069 (9th Cir 2015) (quoting *Daimler AG v. Bauman*, 571 U.S., 117, 133 n.11 (2014)(citations, internal quotation marks and alterations omitted). For corporations, the "paradigm" forums for general jurisdiction are "the place of incorporation and principal place of business." *Daimler*, 571 U.S. at 137. "Only in an 'exceptional case' will general jurisdiction be available anywhere else." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014) (quoting *Daimler*, 571 U.S. at 139 n.19).

Here, it is undisputed that Sanum was incorporated in Macau SAR. *See* Am. Petition at ¶¶ 12, 22 and 50, ECF No. 55. The Amended Petition, however, asserts that "Sanum's principal place of business is Saipan," that it "has no employees in Macau SAR" and that Sanum "does not conduct any business from Macau SAR." *Id.* at ¶ 22. This assertion is refuted by LHNV.

To determine a corporation's principal place of business for general jurisdiction purposes, Sanum asks the court to apply the framework set forth in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010). In *Hertz*, the Supreme Court explained that a corporation's principal of business is "the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Id.* at 92-93. It is often referred to by courts as the "corporation's 'nerve center.'" *Id.* at 93. The Court further explained:

> in practice it should normally be the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Id.*

GOL's allegations in the Amended Petition regarding Sanum's principal place of business being Saipan are refuted by Baldwin's Declaration. As chairman of the Board for Sanum, he asserts that "Sanum's only office, and corporate headquarters, which is regularly staffed by one or more Sanum employees, is in Macau." Decl. John K. Baldwin at ¶¶ 3 and 5, ECF No. 113-2. *See also* Am. Pet. at ¶ 12, ECF No. 55 ("Sanum's registered office is in Macau SAR[.]").

Although Sanum asserts its corporate headquarters are in Macau, the Baldwin Declaration does not specify whether the Macau office is the place where the corporation's officers direct, control and coordinate Sanum's activities. The Amended Petition asserts that "Sanum's business is conducted in Saipan under the control of Baldwin and Scott, residents in Saipan, and through the activities of Bridge [Capital] employees in Saipan – Sanum's 'nerve center' is in Saipan." *Id.* at ¶ 22. The Amended Petition also alleges that Bridge Capital's "former CFO, Crawford, was also Sanum's CFO. Crawford testified: 'The work I do for Sanum is done out of the Bridge Capital

///

///

office [in Saipan]."[11] *Id.* at ¶ 50 (alteration in original).

GOL bears the burden of establishing personal jurisdiction over a defendant, yet it has not supported its conclusory allegations with facts or credible evidence. Aside from the work done by Mr. Crawford for Sanum in Saipan, the Amended Petition fails to specify what business it alleges is conducted in Saipan, how Baldwin and Scott control Sanum's activities in Saipan or what other Bridge Capital employees, aside from Crawford, acted on behalf of Sanum in Saipan. Baldwin's Declaration rebuts GOL's assertions that he and Scott control Sanum's activities in Saipan, stating that when he and Scott

> are in Saipan, they are almost never doing anything in connection with Sanum. Instead [their] time in Saipan is almost entirely dedicated to dealing with issues concerning the businesses [they] own and operate in Saipan and Guam, which are considerable. Sanum is not one of those businesses, and it has no operations in or connection to Saipan. Thus, my consideration of Sanum's affairs did not occur in Saipan.

Decl. John K. Baldwin at ¶ 8, ECF No. 113-2. Additionally, Baldwin avows that "Sanum's accounting is conducted in Cambodia (and not by a Bridge employee). *Id.* at ¶ 6.

Based on the record before it, it is unclear whether Sanum's nerve center is in Macau, Saipan or other location. Given that "[t]he standard for general jurisdiction is high," requiring "continuous and systematic" contacts that "approximate physical presence" within the state, *Tuazon*, 433 F.3d at 1169 and 1171, the court finds that GOL has not met its burden of making a *prima facie* showing that Sanum's direct contacts with the CNMI are sufficient for the court to exercise general jurisdiction over it.

**B. Imputing Contacts of Baldwin, Scott and Bridge to Sanum Under Alter Ego Theory**

GOL next attempts to establish general jurisdiction over Sanum by attributing the contacts

---

[11] Paragraph 50 of the Amended Petition further alleges that Crawford testified "there are no Sanum employees in Macau," but this is a misquote of arbitration testimony. *See* John K. Baldwin at ¶ 4, ECF No. 113-2, and Ex. 1 thereto. Mr. Crawford never testified that there are no Sanum employees in Macau. Instead he stated that Sanum's office in Macau had the same address as the law firm of Mr. Menezes (one of Sanum's lawyers) and that no Sanum employee worked *at Mr. Menezes's legal office*. *Id.*

of Baldwin, Scott and Bridge Capital[12] to Sanum under the alter ego doctrine. "[T]he alter ego test has traditionally been used to bring a controlling parent into a controlled subsidiary's home forum[.]" *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1071 (9th Cir. 2015). Here, however, GOL seeks to use the alter ego test in reverse – to bring a subsidiary into the alleged controlling parent's home forum.

In *Ranza*, the Ninth Circuit held that "the alter ego test may be used to extend personal jurisdiction to a foreign parent or subsidiary when, in actuality, the foreign entity is not really separate from its domestic affiliate." *Id.* at 1073. The Ninth Circuit reasoned

> Because we treat the parent and subsidiary as "not really separate entities" if they satisfy the alter ego analysis, . . . there is no greater justification for bringing the parent into the subsidiary's forum than for doing the reverse. . . . In fact, exercising general jurisdiction over both entities in the parent's forum is just as defensible (if not more so) under due process principles as haling the parent into the subsidiary's forum. If the two entities are to be treated as a single enterprise, the stronger candidate for the "home" of that enterprise is likely where the controlling parent most closely affiliates. . . . And the enterprise as a whole should reasonably foresee being subject to suit for all of its activities – even those unrelated to the forum – where it most closely affiliates.

*Id.* at 1072-73 (internal citations and footnote omitted).

As an initial matter, the court must address Sanum's argument that because the alleged resident alter egos have "either been dismissed (Baldwin and Bridge Capital) or are about to be dismissed on the same grounds (Scott)," Sanum's Mem. Supp. Mot. Dismiss at 16, ECF No. 113-1, "without jurisdiction over one of the supposed resident alter egos, the [c]ourt has no base from which to ***extend*** personal jurisdiction to Sanum on alter ego grounds." Sanum's Reply at 8, ECF No. 126 (emphasis in original). Sanum asserts that "[w]ithout Baldwin, Bridge [Capital], or Scott before this [c]ourt, there is no jurisdiction that could theoretically be extended, so there can be no alter ego jurisdiction over Sanum[.]" *Id.* at 9. While the court recognizes that the parties' briefs were filed before the Ninth Circuit issued its recent ruling reversing this court's dismissal of Baldwin and Bridge Capital from this action, *see* ECF No. 128, such ruling now negates Sanum's argument.

---

[12] The Amended Petition alleges that both Baldwin and Scott maintain residences in Saipan and conduct business from and through the offices of Bridge Capital, which is incorporated in the CNMI and has its principal place of business in Saipan. Am. Pet. at ¶¶ 18-19. Baldwin, Scott and Bridge Capital's contacts with this form are not disputed by Sanum in its filings.

Baldwin, Scott and Bridge Capital are before this court, so their contacts with this forum may be imputed to Sanum under the alter ego theory for general jurisdiction. Accordingly, the court next analyzes whether GOL has satisfied the alter ego test.

1. Legal Standard re Alter Ego Test

Under the alter ego test, a plaintiff "must make out a prima facie case '(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.'" *Id.* (quoting *Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001) (alterations in original)). The first prong of the test requires

> "a showing that the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former." This test envisions pervasive control over the subsidiary, such as when a parent corporation "dictates every facet of the subsidiary's business – from broad policy decisions to routine matters of day-to-day operation." Total ownership and shared management personnel are alone insufficient to establish the requisite level of control.

*Id.* (internal citations omitted).

In determining whether there is sufficient unity of interest and ownership to support alter ego liability, courts consider various factors such as:

> commingling of funds, failure to maintain minutes or adequate corporate records, identification of the equitable owners with the domination and control of the two entities, the use of the same office or business locations, the identical equitable ownership of the two entities, the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual, and failure to adequately capitalize a corporation.

*Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp.3d 42, 52 (N.D. Cal. 2020).

2. Alter Ego Application

The court reviews the allegation in the Amended Petition to determine whether GOL has met its prima facie burden. With regard to a unity of interest and ownership among Baldwin, Scott, Bridge Capital and Sanum, the Amended Petition specifically asserts the following:[13]

---

[13] The numerous allegations regarding unity of interest and ownership among Baldwin, Scott, Bridge Capital and LHNV are not included in the list below because the court must specifically focus on whether Baldwin, Scott, Bridge Capital and *Sanum* are alter egos of each other.

- Baldwin and Scott inserted LHNV into the chain of ownership between themselves and Sanum, thus LHNV owned Sanum's 80% share of the Savan Vegas Casino. Am. Pet. at ¶ 41.H, ECF No. 55;
- Within weeks of signing the Deed of Settlement, Baldwin and Scott "removed $20 million from the [Savan Vegas C]asino, bypassing Sanum and [LHNV], the owners of the . . . casino, by sending the funds to Bridge, themselves and other related persons," without informing "LHNV's Managing Director or Supervisory Board they had taken $20 million from the corporations and appropriated the money to themselves." *Id.* at ¶ 41.J;
- Baldwin and Scott paid all of LHNV and Sanum's legal fees and arbitration costs – amounting to over $10 million – from bank accounts they maintained in Idaho. *Id.* at ¶ 41.N;
- Baldwin personally authorized the loans from Bridge Capital to Sanum of the Laos contracts. *Id.* at ¶ 44;
- Baldwin and Scott "created another source of funds for Bridge to take out of Laos – a Bridge Management Contract to manage Sanum, for which Bridge received additional fees, but Bridge had no management personnel supervising the management of the casino in Laos." *Id.* at ¶ 45;
- Bridge Capital's former CFO, Crawford, was also Sanum's CFO, and he testified that the work he does for Sanum is done out of Bridge Capital's Saipan office. *Id.* at ¶ 50;
- Between 2009 to 2015, Baldwin routinely directed the CFOs of the Savan Vegas Casino to send millions of dollars to entities unrelated to Sanum or the Sanum loan. *Id.* at ¶ 51;
- Based on an audit of the Savan Vegas Casino conducted by BDO Global ("BDO"), Baldwin "caused Savan Vegas to transfer $85.29 million as payments to Sanum and Bridge on the 'Sanum Loan' without applying any amount to the principal of the loan." *Id.* at ¶¶ 52 and 54;
- BDO determined that "Baldwin directed the Savan Vegas CFO to send millions of dollars of the casino's money, and thus 20% of [GOL's] money," to himself and other

Baldwin-related individuals or entities. *Id.* at ¶ 56;

- All these payments identified by BDO "were a fraud on the company and the Savan Vegas company's minority share holders, [GOL] and ST Group. These payments demonstrate Baldwin's total control of LHNV and Sanum and his use of their funds for personal use and to the detriment of his partners and the company." *Id.* at ¶ 57;
- "Baldwin ordered the Savan Vegas CFO to create false invoices from the U.S. law firm he had retained to represent LHNV and Sanum in the arbitrations." *Id.* at ¶ 67;
- "Baldwin directed Crawford, his CFO, to use Sanum's subsidiary Savan Vegas funds to pay Debevoise," the law firm hired to represent LHNV and Sanum's interests at the outset of the treaty arbitrations in 2012. Under the retainer agreement, Debevoise's clients were Bridge Capital, LHNV and Sanum, and Debevoise sent its legal invoices to Bridge Capital's Saipan office. *Id.* at ¶ 68;
- Crawford created the false Debevoise invoices by "copy[ing] the Debevoise letterhead, add[ing] the addressee as Savan Vegas and Casino Co,. [and] add[ing] the amount of the original invoice," to create the impression that the Debevoise invoice was addressed to Savan Vegas. *Id.* at ¶ 69;
- Crawford testified that he created the false Debevoise invoices "because when he sent wire instructions to the Laos bank, [the bank] required a copy of the invoice that was being paid" and Crawford "did not want the bank to see he was paying a Bridge/LHNV/Sanum invoice with Savan Vegas funds" and this was done "to deceive the bank and ultimately the Government." *Id.* at ¶ 70;
- "In this fraud and abuse of the corporate form, Baldwin paid his legal bills to sue the Government using 20% of the Government's casino funds and abused the corporate form of Bridge, Lao Holdings, Sanum and Savan Vegas." *Id.* at ¶ 71;
- "At no time during Baldwin and Scott's control of [LHNV], Sanum and their subsidiary, the Savan Vegas casino, from January 2008 through April 2015, did Baldwin or Scott make or allow any payments from the Savan Vegas casino to the other shareholders, the [GOL] and ST Group. Over that period, Baldwin, with Scott's concurrence, directed the

CFO to transfer over $85 million from Savan Vegas to Sanum and to Bridge [Capital] without a single payment to [GOL], a 20% shareholder in Savan Vegas. GOL discovered this fraud after BDO audited the books in 2015/2016 and revealed the extent of Baldwin's theft from the Savan Vegas shareholders. After 2012, Baldwin directed Crawford to make payments from Savan Vegas directly to Bridge, skipping the loan owner, Sanum, again abusing the corporate form." *Id.* at ¶ 72; and

- Baldwin created a scheme to defraud GOL and the SIAC tribunal by using Bridge Capital funds to pay Gus Noble (the owner of Maxgaming) to sign an MOU that he would buy the Savan Vegas Casino for $220 million, when in fact Mr. Noble was not a bona fide purchaser of the casino. *Id.* at ¶¶ 73-76.

Based on the above factual allegations, the court finds that GOL has satisfied the first pong of the alter ego test. The Amended Petition alleges commingling of funds because funds from the Savan Vegas Casino that belonged to its shareholders (LHNV, GOL and ST Group) were transferred to Bridge, Baldwin and other Baldwin-related individuals and entities, and that in directing that such payments be made, Baldwin abused the corporate form of the various entities. The Amended Petition also alleges identical ownership of the various entities, since Baldwin and Scott are equal shareholders in Bridge Capital and LHNV, with LHNV owning 100% of Sanum. While Bridge Capital and Sanum have separate corporate offices, the Amended Petition alleges that Crawford (who was the CFO for Bridge Capital, Sanum and the Savan Vegas Casino) performed work for Sanum out of Bridge Capital's office in Saipan. Crawford is also alleged to have altered legal invoices in order to deceive the Laos bank and GOL and keep them from discovering that the casino's funds were being used to pay the legal invoices of not only Sanum but Bridge Capital and LHNV as well. In sum, GOL has pled many of the factors of the first prong of the alter ego test. The court finds that GOL has made a prima facie case that there is such unity of interest and ownership that the separate personalties of Baldwin, Scott, Bridge Capital and Sanum no longer exist.[14]

---

[14] The finding that GOL has made a prima facie case as to the unity of interest and ownership prong is consistent with the court's earlier ruling that sought to challenge the filing of the Amended Petition on futility grounds. Baldwin and Bridge Capital opposed the filing of the then proposed

Having satisfied the first prong, the court next analyzes whether GOL has made a prima facie case that failure to disregard their separate identities would result in fraud or injustice. Here, the Amended Petition asserts that GOL has made demand upon LHNV and Sanum to pay the arbitration awards, but they have not paid any amount. Am. Pet. at ¶ 37A, ECF No. 55.

> Baldwin and Scott view [LHNV], Sanum, and Bridge, the corporations and their funds as their personal tools and their personal funds which they can use for whatever reason, including committing criminal acts. They have no regard for the corporate form or corporate purposes. Respondents' abuse of corporate form in many instances to commit fraud on its partners, Tribunals and government entities and to commit criminal acts is compelling evidence mandating that this court pierce the corporate veils of [LHNV], Sanum and Bridge. Equity demands that Baldwin and Scott are personally liable for the debts of [LHNV] and Sanum incurred in these arbitrations.

*Id.* at ¶ 79.

Based on these assertions and the other claims noted *supra*, GOL has sufficiently alleged facts to meet its burden of showing how Baldwin, Scott and Bridge Capital have benefitted from the their alleged misconduct and purported abuse of the corporate forms of LHNV and Sanum. The court further finds that GOL has made a prima facie case that failure to disregard said entities separate identities would result in injustice to GOL, who has yet to be paid for the three arbitral awards in its favor.

## IV. CONCLUSION

Imputing Baldwin, Scott and Bridge Capital's contacts onto their foreign subsidiary, the court finds that Sanum's contacts with the CNMI are of such quality and nature that it could reasonably expect being haled into court in this forum. Having found that GOL has met its burden of establishing that this court has general jurisdiction over Sanum under the alter ego theory, there is no need for the court to address Sanum's remaining argument that this court lacks specific jurisdiction over Sanum. Accordingly, the court denies Sanum's Motion to Dismiss the Amended Petition.

**IT IS SO ORDERED.**

**Frances M. Tydingco-Gatewood**
**Designated Judge**
**Dated: Oct 15, 2026**

---

Amended Petition, arguing that it failed to state a valid veil-piercing or alter ego claim, but the court found that the claim was plausible. *See* Order Granting GOL's Mot. Amend at 1-3, ECF No. 50.